UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| RYAN PEARL, individually and as next friend of B.P., a minor, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 6:24-CV-018-H |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In early February 2023, the stop sign on Olsak Road, a country lane southeast of San Angelo, Texas, went missing. The stop sign guarded the entrance to FM 765, a two-lane highway. The local road departments failed to replace it. But these events have no bearing on what happened next. Jayleah Everitt, a new driver for the United States Postal Service, barreled down Olsak Road. She was not paying attention to any of the numerous warnings that an intersection was ahead—the approach sign, the power lines paralleling FM 765, or the cars driving on the highway.

The United States bears sole responsibility for what followed. Everitt flew into the intersection at 41 miles per hour, collided with a minivan, and sent the minivan airborne. Two passengers were ejected from that vehicle; the third remained inside. All three suffered severe injuries, and they face a lifetime of pain and suffering from the crash. The crash victims—Alexandria Nieto, her minor daughter J.G., and J.G.'s minor friend B.P.—along B.P.'s father, sue the United States under the Federal Tort Claims Act (FTCA). After a three-day bench trial in February 2026, the parties expressed an interest in mediation. Mediation failed, and so it remains for the Court to resolve this dispute.

The following findings of fact and conclusions of law are based on the evidence presented at trial, including the Court's observation of the witnesses and their relative credibility; the parties' arguments and post-trial supplemental briefing; and applicable authorities. Having considered the entire record, the Court rules against the United States and in favor of the plaintiffs and concludes that the United States is liable for all of the plaintiffs' recoverable damages. Specifically, the United States cannot avoid or reduce liability based on Nieto's failure to wear a seatbelt, and it cannot reduce liability for Tom Green County and TxDOT's failure to replace the Olsak Road stop sign. *Infra*, Conclusions of Law § 2(B)(ii)(a)–(b). The defendant is liable for Nieto's damages for past and future medical expenses, pain, suffering, mental anguish, and disfigurement in the amount of $2,022,929.04. *Id.* § 2(B)(iii). The defendant is liable for J.G.'s damages for past and future medical expenses, pain, suffering, mental anguish, and disfigurement in the amount of $2,838,973.16. *Id.* And the defendant is liable for B.P.'s damages for past and future medical expenses, future loss of earning capacity, pain, suffering, mental anguish, and disfigurement in the amount of $3,750,606.00. *Id.* The Court finds, however, that no plaintiff continues to suffer from a traumatic brain injury (TBI) and no plaintiff is at risk of developing dementia. *Infra*, Findings of Fact § 1(D)(i)(d)(2), (ii)(c), (iii)(c). Damages are adjusted accordingly.

## 1. Findings of Fact[1]

The Court finds that the following facts have been established by a preponderance of the evidence.

[1] Any of the Court's findings of facts that also constitute a conclusion of law is adopted as such, and any conclusion of law that also constitutes a finding of fact is adopted as such.

### A. The Intersection

FM 765 is a state highway. It begins on the outskirts of San Angelo, Texas and proceeds due east across flatland farming country. When weather is clear, it is a place where a person can see for miles. Southeast of the city, FM 765 intersects with small gravel roads, including Olsak Road. Pl.'s Ex. 1 at 3.




*Figure 1: Intersection of Olsak and Wilde Roads with FM 765 (Google Maps Screenshot).*[2]

Olsak Road approaches FM 765 from the north. Just before the intersection is a house and a set of agricultural buildings.[3] The buildings are set back from both Olsak Road and FM 765, such that they could only obstruct the view of a driver headed southbound

[2] The Court takes judicial notice of this image pursuant to Federal Rule of Evidence 201. *See also* Pl.'s Ex. 17 (body camera footage of police response to crash).

[3] Newman Test., Hr'g Tr. Vol. II 176:10–21, Dkt. No. 80.

"[a]t a distance."[4] Even then, once a driver is past the buildings, he or she would have a "significant[]" amount of distance—about "200 to 300 meters"—before reaching the intersection.[5] Moreover, when passing the agricultural buildings, a driver is alerted to the presence of an intersection by a yellow stop-ahead sign and the stop sign itself.



*Figure 2: Pl.'s Ex. 10 at 4.*

Once a driver passes the buildings, the road is clear of obstructions. On the morning of February 12, 2023, there were no crops or tall grass to obstruct the view of any driver

[4] *Id.* at 177:3.

[5] *Id.* at 177:21–22.

proceeding down Olsak Road.[6] The weather was clear.[7] Along with the absence of obstructions, the terrain featured two conspicuous features—power lines running parallel to FM 765 and the boundaries of crop fields on the other side of FM 765—that signaled the presence of an intersection. The only difference between February 12 and a normal day was that the Olsak Road stop sign was missing.




*Figure 3: Portion of Pl.'s Ex. 24; see also* supra*, Figure 2.*

**B. The Stop Sign**

The stop sign went missing the week before February 12.[8] A local resident saw that the sign was gone, so he called Ernest Galindo, the local superintendent for the Tom Green

[6] *See also* Pl.'s Ex. 10 at 2–3, 28, 46–70 (depicting Olsak Road and nearby buildings from different angles).

[7] Everitt Test., Hr'g Tr. Vol. I 32:16–18, Dkt. No. 79.

[8] Pl.'s Exs. 1 at 3; 24; Galindo Test., Hr'g Tr. Vol. II 180:17–181:10, Dkt. No. 80.

County Road and Bridge Department.[9] In response, Galindo drove to the site and determined that, because the stop sign sat on the easement for FM 765, responsibility for maintenance fell with the Texas Department of Transportation (TxDOT).[10]

While Galindo claimed to have called the local TxDOT supervisor, Evan Jones, to alert him of the missing stop sign, that assertion is not credible.[11] Rather, the evidence shows that, while Galindo and at least one other road department employee were aware of the missing stop sign, they did not inform TxDOT, and neither Jones nor TxDOT was aware of the missing stop sign until after the crash occurred.[12] Thus, in the days that followed, Tom Green County declined to replace TxDOT's sign, and TxDOT remained unaware of the road hazard. The intersection lay unguarded.

### C. The Crash

February 12 was Everitt's first day driving for USPS.[13] It was also "Amazon delivery day," which meant Everitt was driving with a "smartphone-like device that [gave her]

[9] Galindo Test., Hr'g Tr. Vol. II 180:17–181:10, 185:9–16, Dkt. No. 80.

[10] *Id.* at 181:20–182:4.

[11] Galindo's assertion is not credible for two reasons. First, Galindo declined to assert unequivocally that he called Jones. *See* Galindo Test., Hr'g Tr. Vol. II 182:5–9, Dkt. No. 80. Counsel for the plaintiffs pressed Galindo with the facts that Jones denied receiving a phone call and no phone records existed of their conversation. Counsel asked whether Galindo "[was] misremembering" events. *Id.* at 189:25–190:2. Galindo replied that he "could be." *Id.* at 190:3.

Second, Galindo previously denied calling Jones. When he spoke to Tom Green County's attorney, he denied calling Jones and pinned responsibility for making the call on a coworker, who in turn pinned responsibility on Galindo. Rothband Test., Dep. Tr., 26:5–27:4, 27:15–25, Pl.'s Ex. 96.

[12] Jones testified that he did not learn about the missing stop sign until after the crash. Jones Test., Dep. Tr. 72:2–9, Pl.'s Ex. 95. The only evidence suggesting someone other than Galindo called Jones or TxDOT is Galindo's half-certain assertion that the person who reported the sign missing told Galindo he would also call TxDOT. Galindo Test., Hr'g Tr. Vol. II 185:13–16, Dkt. No. 80. But given Galindo's shaky testimony, the Court finds this evidence is not credible. *See supra*, n.11.

[13] Everitt Test., Hr'g Tr. Vol. I 31:12–20, Dkt. No. 79.

turn-by-turn directions" to deliver the individual packages throughout rural Tom Green County.[14]

That same morning, Alexandria Nieto was at home with her two children, including 14-year-old J.G.[15] Nieto was busy helping her youngest prepare for a Valentine's Day party at school when J.G. asked her to drive J.G. and J.G.'s friend B.P. to a softball event.[16] Nieto drove to B.P.'s house, picked her up, and the two girls began chatting away.[17] J.G. sat in the front passenger seat while B.P. sat in the back.[18] It was a normal morning for Nieto and for the two young girls. Nieto began to drive westbound on FM 765.[19]

At about noon, both Nieto and Everitt began to approach the intersection of FM 765 and Olsak Road.[20] Nieto was driving westbound at about 75 miles per hour, which is the speed limit for FM 765.[21] There was a vehicle behind her, as well as "oncoming traffic in the other lane."[22]

Everitt was driving southbound on Olsak Road towards the intersection. She was driving at about 41 miles per hour.[23] Though the stop sign was gone, had Everitt observed the road, she would have seen the clear indicators that an intersection lay ahead. Again, it

---

[14] *Id.* at 31:21–32:7.

[15] Nieto Test., Hr'g Tr. Vol. II 65:20–66:2, Dkt. No. 80.

[16] *Id.* at 65:24–66:16.

[17] *Id.*

[18] Pl.'s Exs. 1 at 2; 2 at 1.

[19] *Id.*; *see* Pl.'s Ex. 1 at 3.

[20] Everitt Test., Hr'g Tr. Vol. I 31:12–14, Dkt. No. 79.

[21] Rodgers Test., Hr'g Tr. Vol. I 26:9–15, Dkt. No. 79; Newman Test., Hr'g Tr. Vol. II 158:21–23, Dkt. No. 80; Pl.'s Ex. 1 at 3.

[22] Rodgers Test., Hr'g Tr. Vol. I 25:20–21, Dkt. No. 79.

[23] Pl.'s Ex. 9; Dkt. No. 66 at 3 (stipulation).

was a clear day with no obstructions, powerlines and fields pointed to the intersection, and traffic traversed FM 765 in both directions.

But Everitt testified that she did not see the stop-ahead sign.[24] She did not see any traffic.[25] She was simply unaware that there was an intersection.[26] So she did not slow down; she did not brake; she did not look left; and she did not look right.[27] Everitt conceded that she was wearing headphones at the time, but she denied listening to music or anything that would have distracted her further.[28] Even so, Everitt says, she was watching the road.[29]

The Court finds her admission to wearing headphones credible, but the notion that Everitt was looking dead ahead when she careened into FM 765 is not credible. Even a distracted driver is not totally oblivious. Blaring music on a radio, for example, is dangerous behavior, but it does not prevent one from looking at the road unfolding ahead. Had Everitt actually looked forward, she would have at least had a "significant" stretch of road to see the crisscrossing traffic, the power lines, and fields that screamed "danger ahead."[30] Had she done so, she would have had a moment—even if it were too late—to reduce her speed by applying the brakes. She did no such thing.

That leaves one of two explanations. Everitt was either not looking at the road at all, or—if she was—her eyes were glazed over in complacency from whatever distraction was coming from her headphones. Either explanation is corroborated by her own

---

[24] Everitt Test., Hr'g Tr. Vol. I 33:4–5, Dkt. No. 79.

[25] *Id.* at 44:22–45:5.

[26] *Id.* at 42:1–5.

[27] *Id.* at 40:3–11, 41:21–25.

[28] *Id.* at 40:18–20, 43:4–10.

[29] *Id.* at 43:8–11.

[30] *See* Newman Test., Hr'g Tr. Vol. II 177:8–22, Dkt. No. 80.

testimony—that she saw nothing around her and did nothing as a result. Her testimony was a shocking testament to her distracted or mindless driving. Whatever she was doing, it was well below the standard of what any reasonable-minded person would do when driving down a country road for the first time. Even if the stop sign had been there in the first place, the tragedy that followed would have still transpired.[31]

* * *

(intentionally left blank)

[31] Alternatively, assuming *arguendo* that the stop sign's presence would have changed Everitt's response, the Court finds that Tom Green County did not create the hazard, nor did it control the stop sign; and the Court further finds that TxDOT lacked actual notice of the hazard prior to the crash.

The vehicles collided. James Rodgers, who was driving immediately behind Nieto, described Everitt's postal van as a "white blur."[32] The crash "was instantaneous," sending Nieto's minivan "airborne."[33] Nieto and J.G. were ejected from the vehicle and landed in the field nearby.[34] All three women were severely injured by the crash and required hospitalization.



*Figure 4: Pl.'s Ex. 15 at 2 (Everitt's van).*

[32] Rodgers Test., Hr'g Tr. Vol. I 26:19–23, Dkt. No. 79.

[33] *Id.* at 27:13–17.

[34] Nieto Test., Hr'g Tr. Vol. II 93:1–6, Dkt. No. 80.



*Figure 5: Pl.'s Ex. 15 at 3 (Nieto's vehicle).*

**D. Injuries**

At trial, the weight of the parties' testimony and evidence centered on the nature and extent of Nieto, J.G., and B.P.'s injuries. The Court considers their injuries one by one.

**i. Nieto**

**a. Nieto's Failure to Wear a Seatbelt**

As a preliminary matter, the Court addresses the defendant's contention that Nieto is "at least 50% responsible for the injuries she actually sustained," past and future, because of her failure to wear a seatbelt. Dkt. No. 83 at 21; *see id.* at 27. While Nieto failed to wear a seatbelt, and while her injuries were serious, there is minimal evidence here that her injuries would have been less severe had she remained buckled in. *See Le v. United States*, 138 F.4th

264, 277 (5th Cir. 2025) (*Le II*) (affirming finding that "[w]ithout more concrete evidence of cause-in-fact," unbelted victim could not be held responsible for failure to wear seatbelt).

Each victim suffered serious injuries as a result of the crash. Their injuries were, on the whole, fairly similar.[35] The primary difference between the injuries suffered by the ejected victims, Nieto and J.G., as compared to B.P., was that the ejected victims were pocked with glass shards in the crash, while B.P. was apparently not.[36] But that evidence is insufficient given the severity of the crash. Photos show that the right side of the car essentially caved in.[37] Each window was destroyed.[38] Nieto also testified that she was facing "to the right"—that is, towards the destroyed window—when the crash happened.[39] So at the moment of the crash, J.G. and B.P. were on the caved-in side of the vehicle; Nieto was facing it, and, while both J.G. and Nieto were ejected, they were also next to a window that was destroyed in the crash.[40] It is plausible, then, that the glass injuries to both Nieto and J.G. resulted from glass bursting on the front passenger-side window, rather than from being ejected. In light of the above, the Court lacks sufficient evidence to show that Nieto's injuries would have been different had she worn her seatbelt.[41]

---

[35] *See* Dkt. No. 82 at 25–26 (noting similarity between Nieto's injuries and B.P.'s injuries).

[36] *See* Nieto Test., Hr'g Tr. Vol. II 79:10–25, Dkt. No. 80.

[37] *See* Pl.'s Ex. 12 at 9–10.

[38] *Id.*

[39] Nieto Test., Hr'g Tr. Vol. II 67:4–12, Dkt. No. 80.

[40] *See* Pl.'s Exs. 1 at 2; 2 at 1.

[41] The Court notes that Nieto was later cited for failing to wear a seatbelt and for failing to secure J.G.'s seatbelt. Pl.'s Ex. 1 at 3. For the reasons stated above, that fact is immaterial to whether she contributed to her own injuries.

**b. Physical Injuries**

Paramedics found Nieto on the ground, bleeding; her face was littered with glass.[42] The crash collapsed one of her lungs.[43] Her body was marked with lacerations, scarring, and fractures to her spine, arm, radial bone, and clavicle.[44] Nieto's time in the hospital was marked by severe pain, and she remained hospitalized for four days.[45]

But Nieto's release from the hospital did not mean the end of her physical injuries. Following her release, Nieto needed to return for further treatment to her clavicle.[46] She continued to report pain and attended physical therapy for treatment.[47] The Court also heard testimony from Nieto that she suffered scarring from the crash and continues to shed glass lodged in her body from the crash.[48]

Three years on, however, the defendant contends that there is insufficient evidence to establish that Nieto needs "lifelong future medical care as a result of the accident." Dkt. No. 83 at 24–25. The Court disagrees. While there was evidence presented at trial showing that Nieto is no longer undergoing treatment for a number of her physical injuries,[49] Nieto testified that she continues to suffer physical pain from the crash. She noted that her back pain has persisted, requiring her to use a special chair at work and resulting in pain when

---

[42] Pl.'s Ex. 151 at 2; Nieto Test., Hr'g Tr. Vol. II 67:2–15, Dkt. No. 80.

[43] Goff Test., Hr'g Tr. Vol. I 227:9–12, Dkt. No. 79.

[44] *See* Marks Test., Hr'g Tr. Vol. II 227:23–228:9, Dkt. No. 80; Pieroth Test., Hr'g Tr. Vol. III 16:7–17:2, Dkt. No. 81; *see also* Pl.'s Ex. 11 at 1.

[45] Pl.'s Exs. 152 at 901; 166 at 662.

[46] *See* Pl.'s Ex. 166 at 426; Def.'s Ex. 21.

[47] *See* Def.'s Ex. 41.

[48] Nieto Test., Hr'g Tr. Vol. II 77:16–78:2, 80:22–81:17, Dkt. No. 80.

[49] *See* Dkt. No. 83 at 4 (citing Pl.'s Ex. 152 at 626, 1184, 1188–91, 1200–01, 1430).

sitting elsewhere.[50] She suffers from severe migraines that impede her day-to-day activities.[51] She also suffered injuries to her foot and leg and continues to suffer from the consequences of that injury.[52] The Court does not find, as was suggested at trial, that these pains are the product of Nieto's ongoing depression and anxiety,[53] as that testimony is inconsistent with descriptions of Nieto's physical and mental health prior to the crash.[54]

**c. Injuries to Mental Health**

While Nieto had preexisting anxiety and depression,[55] the evidence at trial establishes that her mental health declined as a result of the crash, exacerbating both conditions.[56] She also reported memory and attention issues, which the defendant contends stems from her depression, rather than a TBI.[57] The Court finds below that Nieto no longer suffers from her TBI, and thus the Court agrees that her present cognitive issues are the

---

[50] Nieto Test., Hr'g Tr. Vol. II 73:1–7, Dkt. No. 80.

[51] *Id.* at 78:8–79:9.

[52] *See* Goff Test., Hr'g Tr. Vol. II 36:14–17, Dkt. No. 80. The defendant disputes the existence of this injury, perceiving that Nieto instead suffered a meta*carpal* injury (which she did). *See* Dkt. No. 83 at 4 n.3 (citing Def.'s Ex. 23 at 8, 11); *see also* Pl.'s Ex. 152 at 580, 583 (same). But Nieto's medical records from July 2024 clearly indicate that Nieto "broke her . . . 5th metatarsal" and "[s]he now has sharp pain radiating from her right 5th digit down to her right leg/foot," and that the nerve damage is "permanent." Pl.'s Ex. 162 at 99.

[53] Goff Test., Hr'g Tr. Vol. II 13:12–15, Dkt. No. 80.

[54] In sum, that evidence established that Nieto previously suffered from obesity, diabetes, anxiety, and depression. Nieto Test., Hr'g Tr. Vol. II 99:13–21, 283:22–286:17, 288:14–289:14, Dkt. No. 80. The evidence does not establish, however, that Nieto suffered similar physical ailments before the crash. Indeed, one of Nieto's coworkers noted Nieto's "driven" and "high[-]energy" disposition before the crash without mention of physical pain, Stevens Test., Dep. Tr., 10:10–12:1, Pl.'s Ex. 103, and contrasted Nieto's former health with her post-crash physical pain, headaches, and fatigue, *id.* at 14:22–15:17.

[55] *See supra*, n.54.

[56] *See* Goff Test., Hr'g Tr. Vol. II 38:24–40:17, Dkt. No. 80; Pl.'s Ex. 77; *see also* Goff Test., Hr'g Tr. Vol. II 38:24–40:17, Dkt. No. 80 (noting that Nieto underwent counseling and mental health treatment following the crash).

[57] *See* Def.'s Closing Statement, Hr'g Tr. Vol. III, 269:22–270:18, Dkt. No. 81 (discussing Def.'s Ex. 53a at 9 (report of Dr. Joseph Etherton)).

result of a mental health disorder. But because the crash exacerbated these problems, the defendant is no less responsible. Moreover, Nieto's continued mental health challenges are accounted for in Dr. Goff's treatment recommendation.[58]

**d. Neuropsychological Injuries**

A critical dispute at trial was whether each victim is permanently impaired by, and requires lifelong treatment for, a TBI sustained as a result of the crash. As to Nieto, the plaintiffs assert that the crash has left her with memory and concentration issues. *See* Dkt. No. 82 at 74. They also assert, though with more limited evidence compared to that presented for J.G. and B.P., that she is at risk of developing dementia later in life due to her TBI. *Id.* at 49.

**1. Nieto suffered an uncomplicated mild TBI and has recovered.**

The Court agrees with the defendant that Nieto's brain injury was an uncomplicated mild TBI. That conclusion is supported by the testimony of multiple expert witnesses.[59] TBIs are either "mild," "moderate," or "severe," and can be "complicated" or "uncomplicated."[60] Where, as here, the patient does not present any "radiologic findings," such as internal hemorrhaging, the TBI is uncomplicated.[61] Severity is defined in part with reference to the Glasgow Coma Scale, which "is an assessment of [the patient's] level of

---

[58] *See* Pl.'s Ex. 77; *see also* Goff Test., Hr'g Tr. Vol. II 38:24–40:17, Dkt. No. 80 (noting that Nieto underwent counseling and mental health treatment following the crash).

[59] *See* Marks Test., Hr'g Tr. Vol. II 212:11–14, Dkt. No. 80; Pieroth Test., Hr'g Tr. Vol. III 10:9–13, Dkt. No. 81.

[60] Pieroth Test., Hr'g Tr. Vol. II 266:20–267:5, Dkt. No. 80.

[61] *Id.*; Elaine de Guise et al., Comprehensive Clinical Picture of Patients with Complicated vs Uncomplicated Mild Traumatic Brain Injury, 24 The Clinical Neuropsychologist 1113, 1115 (2010), Def.'s Ex. 10.

alertness," with a lower score indicating a more severe injury.[62] A patient has a mild TBI if he scores between a 13 or 15 on the scale.[63] Nieto scored a 14.[64]

The parties dispute whether Nieto's mild TBI has long-lasting effects. Mild TBIs are common, and patients typically recover fast. For adults, full recovery "usually" happens within two to 10 days; "for pediatrics, usually two to four weeks" or else 30 days.[65] But that is not always the case. If a patient does not recover within the first month, recovery may take "months" or "up to a year."[66] Other patients suffer permanent brain damage. A patient reporting TBI-related symptoms after three months only has a 27% chance of permanent recovery; otherwise, he will experience lifelong effects.[67]

The Court finds that Nieto has recovered from her TBI. Nieto reported feeling able enough to return to work in June 2023—about four months after the crash.[68] That is roughly within the three-month window during which the typical patient with protracted TBI-related symptoms recovers. Moreover, while Nieto continued to suffer from other aggravating harms, such as depression and anxiety relating from the crash, Dr. Joseph Etherton, a clinical psychologist who evaluated Nieto, found no objective evidence of a

[62] Parnes Test., Hr'g Tr. Vol. I. 71:21–23, Dkt. No. 79.

[63] Pieroth Test., Hr'g Tr. Vol. III 18:22–24, Dkt. No. 81.

[64] *Id.* at 19:17–18 (discussing Pl.'s Ex. 151 at 3).

[65] Nippoldt Baca Test., Hr'g Tr. Vol. III 73:13–18, Dkt. No. 81; King Test., Dep. Tr. 10:14–11:6, Pl.'s Ex. 101 (explaining that 30 days is the normal period for resolution).

[66] Parnes Test., Hr'g Vol. I 74:19 – 75:17, Dkt. No. 79; King Test., Dep. Tr. 10:14–11:6, Pl.'s Ex. 101 (noting that some patients may require two to five years to recover).

[67] *See* Pieroth Test., Hr'g Tr. Vol. III 28:17–29:25, Dkt. No. 81 (discussing Carmen Hiploylee, et al., Longitudinal Study of Postconcussion Syndrome: Not Everyone Recovers, 34 Journal of Neurotrauma 1511, 1518 (2017), Pl.'s. Ex. 211).

[68] Marks Test., Hr'g Tr. Vol. II 212:15–20, Dkt. No. 80.

decline from pre-injury or pre-morbid functioning.[69] The Court by no means discounts Nieto's own testimony, nor the deposition of her one-time coworker, who testified to her persistent memory issues following the crash.[70] And the Court rejects the suggestion that because "most people recover" from mild TBIs, it means Nieto or the other plaintiffs have, too. Dkt. No. 82 at 32. But the evidence establishes that Nieto's symptoms are best attributed to her stress and mental health following the crash, rather than lingering symptoms of a TBI.[71]

**2. Nieto does not face an increased risk of dementia.**

Separately, the Court finds that Nieto is not at an increased risk of developing dementia later in life due to the crash. *See id.* at 49. Both parties presented extensive evidence on this point. The critical points are as follows.

The plaintiffs presented testimony supported by academic literature.[72] Their evidence included, for example, a study asserting that even mild TBIs are associated with a heightened risk of dementia later in life.[73] Another study, discussed by Dr. Parnes in his testimony, observed that this risk remains even without a loss of consciousness.[74]

---

[69] *See id.* at 213:5–14; Def.'s Ex. 54a at 9–10 (report of Dr. Etherton); *see also* Marks Test., Hr'g Tr. Vol. II 232:6–233:15, Dkt. No. 80 (observing that recovering patients experience "waxing and waning" symptoms, but that "once [a patient] hits a level of improvement, [he] should stay there").

[70] *See* Stevens Test., Dep. Tr., 14:22–15:17, Pl.'s Ex. 103.

[71] *See* Marks Test., Hr'g Tr. Vol. II 213:10–214:17, Dkt. No. 80 (discussing somatization).

[72] *See, e.g.*, Parnes Test., Hr'g Tr. Vol. I 95:24–99:19, Dkt. No. 79.

[73] *Id.* at 96:9–20 (discussing Yi-Kung Lee, et al., Increased Risk of Dementia in Patients with Mild Traumatic Brain Injury: A Nationwide Cohort Study, 8 PLOS ONE No. 5 (2013), Pl.'s Ex. 179).

[74] *Id.* at 97:22–99:19 (discussing Deborah E. Barnes, et al., Association of Mild Traumatic Brain Injury With and Without Loss of Consciousness With Dementia in US Military Veterans, 2018 JAMA Neurology, 1, 4 (May 7, 2018), Pl.'s Ex. 174).

In turn, the defendant's evidence primarily rested on the testimony of Drs. Warren Marks and Elizabeth Pieroth. Dr. Marks is a pediatric neurologist with over 30 years of experience in his field, which includes extensive treatment of TBI patients.[75] He described the purported dementia risk as "a significant overstatement" based on the existing medical literature.[76] Dr. Marks observed that there are more than 35 medical conditions "that are listed as [having] possible associations with dementia," and that moderate and severe TBIs are associated conditions.[77] However, Dr. Marks clarified that these are merely associated conditions, and observed that among the risk factors, only one (a genetic mutation) was likely to have a causal relation to dementia.[78] He conceded the possibility that TBIs may have a "very small" causal role, but he declined to venture further.[79] At bottom, the prevalence of numerous alternative explanations rendered the potential association between TBIs and dementia too weak to conclude that the crash victims were more likely in any meaningful sense to develop dementia later in life.[80]

Dr. Pieroth also questioned the strength of the plaintiffs' cited articles. Dr. Pieroth is a clinical neuropsychologist with approximately 30 years of experience working with patients with TBIs.[81] Dr. Pieroth testified that "the body of research does not support [the] opinion" that TBIs cause dementia.[82] Like Dr. Marks, Dr. Pieroth warned that "any single

---

[75] *See* Marks Test., Hr'g Tr. Vol. II 192:8–194:8, Dkt. No. 80.

[76] *Id.* at 207:3–19.

[77] *Id.*

[78] *Id.* at 207:3–19, 208:9–20.

[79] *Id.* at 208:21–24.

[80] *See id.* at 250:22–251:7.

[81] Pieroth Test., Hr'g Tr. Vol. II 259:9–10, 260:22–161:4, Dkt. No. 80.

[82] *Id.* at 294:3–22.

study has limitations, and [they are] a starting point"—but not the final word.[83] In her opinion, the prevailing medical consensus "does not demonstrate that a single mild [TBI] results in increased rates of dementia as [the patient] turn[s] sixty," and Nieto is not at risk of "develop[ing] dementia or other cognitive impairments as a result of her TBI."[84]

The Court has considered the evidence raised by the parties' witnesses and all other evidence on the record. The expert witnesses on both sides were credible and thorough—as was the literature admitted by the plaintiffs on this dispute. However, the Court finds the testimony of Drs. Marks and Pieroth to be more persuasive given their extensive experience in the field and encapsulation of the literature and issues before the Court.

The plaintiffs rally to the number of articles that they submitted on the topic. *See* Dkt. No. 82 at 33–36. They contrast that with the defense experts' testimony, urging that their "failure to engage with the literature in trial [is] not just an evidentiary deficiency," but a "credibility" issue, too. *Id.* at 34 (citing Fed. R. Evid. 803(18)). To be clear, the Court will not "accept conclusions on the *ipse dixit* of experts." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Neither will the Court tally articles nor consider the articles beyond their limited purpose subject to Federal Rule of Evidence 803(18). But the Court disagrees that the phrase "*ipse dixit*" describes the testimony of the two doctors. Had their testimony been the subject of an admissibility issue, the plaintiffs might have objected before or at trial, but no such objection was raised. Indeed, on cross-examination, the plaintiffs questioned the doctors on articles cited in their reports, demonstrating the doctors' familiarity with the

---

[83] *Id.*

[84] Pieroth Test., Hr'g Tr. Vol. III 6:1–20, Dkt. No. 81.

data.[85] Besides this, the plaintiffs' attack fails to address Drs. Marks and Pieroth's decades of experience in the field. The Court will not use Rule 803(18) as a cudgel against two patently qualified and credible experts.

The plaintiffs also criticize the defendant's experts for reaching conclusions without having treated the crash victims or having reviewed the treatment data from the plaintiffs' exams, suggesting that these purported failures raise an admissibility issue. *Id.* at 37–39 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (observing that experts must "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field")). But the dispute here boils down to one of causal link as set forth in medical literature.[86] Meeting with Nieto, J.G., and B.P. would not answer the question—one way or the other—whether medical data shows that a single mild TBI increases the risk of dementia and thus that Nieto, J.G., and B.P. face the same risk.

It may be that, in time, medical experts will come to adopt the plaintiffs' view. The Court by no means suggests that the medical literature and testimony offered by the plaintiffs is not credible or baseless. However, the burden rests on the plaintiffs here and now. And the weight of the testimony, medical literature, and all other evidence in this case fails to causally link a single instance of mild TBI to an increased risk of dementia later in life. Thus, the Court finds that Nieto does not face a higher risk of dementia as a result of the TBI she sustained from the crash.

---

[85] *See id.* at 30:21–31:12; Marks Test., Hr'g Tr. Vol. II 248:2–251:12, Dkt. No. 80.

[86] To the extent the plaintiffs raise this argument to attack other portions of the expert's testimony—namely, the severity of the plaintiffs' TBIs and whether they will recover—the Court is unpersuaded in light of the evidence discussed in this Findings of Fact and Conclusions of Law.

#### ii. J.G.

Next, the Court turns to J.G.

##### a. Physical Injuries

Like her mother, J.G. was ejected from the vehicle and landed in the field nearby. J.G.'s injuries required her to be life-flighted to Shannon Medical Center in San Angelo.[87] The crash caused her to receive lacerations and cuts throughout her body and a hematoma on her head.[88] Miraculously, she was discharged from the hospital on the same day.[89] However, for months after the crash, J.G. suffered from post-concussive headaches and post-traumatic vestibular dysfunction, which required months of treatment in a hyperbaric oxygen chamber.[90] In addition, J.G. fractured a tooth in the crash, which required a root canal and crown, and will require at least some additional treatment.[91] There is no evidence that J.G. suffered from physical ailments prior to the crash.

The defendant asserts that J.G. has fully recovered from the orthopedic injuries she sustained in the crash. *See* Dkt. No. 83 at 11. At trial, however, the plaintiffs presented evidence in the form of an examination from Dr. Goff indicating that J.G. continues to suffer from neck pain, lower back pain, and an injury to her left shoulder.[92] Nieto also testified that both she and her daughter take medication to treat their lingering pain.[93] J.G.

---

[87] *See* Pl.'s Ex. 129 at 3.

[88] Pl.'s Ex. 142 at 712, 733.

[89] *See* Goff Test., Hr'g Tr. Vol. II 8:11–20, Dkt. No. 80.

[90] *See* Pl.'s Ex. 142 at 421.

[91] Goff Test., Hr'g Tr. Vol. I 232:21–233:8, Dkt. No. 79; *see also* Dkt. No. 83 at 12 (contesting Dr. Goff's estimated treatment cost but conceding that "it is appropriate" to provide some additional dental care).

[92] *See* Goff Test., Hr'g Tr. Vol. I 215:3–10, Dkt. No. 79; Pl.'s Ex. 131 at 689.

[93] Nieto Test., Hr'g Tr. Vol. II 76:19–23, Dkt. No. 80.

also suffers from permanent scarring,[94] which has led her to become the victim of bullying at school.[95] Thus, the Court finds that J.G. continues to suffer from physical ailments as a result of the crash.

**b. Injuries to Mental Health**

No evidence suggests that J.G. suffered from any mental illness before the crash.[96] Following the crash, J.G. developed depression, anxiety, insomnia, and PTSD.[97] She will require long-term treatment for these symptoms. The defendant focuses on the last diagnosis in its trial brief, pinning J.G.'s mental state on "many other stressors in her life related to her family history, relationships, and being told that she has permanent brain damage and will be unable to attend college or get better." Dkt. No. 83 at 10. And one defense witness suggested both J.G. and B.P.'s maladies are the result of teenage hormones and transitioning to adulthood.[98]

While the record reveals that J.G. has many stressors in her life, and while the Court does not doubt that any teenager will face some adversity on the road to adulthood, the Court does not agree that these facts point to a lack of PTSD or that her mental health issues

---

[94] Goff Test., Hr'g Tr. Vol. I 215:3–10, Dkt. No. 79.

[95] Nieto Test., Hr'g Tr. Vol. II 77:16–78:2, 80:22–82:17, Dkt. No. 80.

[96] *See* Grandison Test., Hr'g Tr. Vol. I 138:21–139:11, Dkt. No. 79 (stating there was no evidence that J.G.'s attention problems were the result of preexisting ADHD). During closing statements, the Court asked counsel for the defendant whether there was any evidence of J.G. having "objective indicators of depression" prior to the crash. Def.'s Closing Statement, Hr'g Tr. Vol. III 277:11–18, Dkt. No. 81. Counsel denied awareness of any evidence on this point, *id.*, and the defendant's amended proposed findings of fact and conclusions of law are silent on this point. *See* Dkt. No. 83 at 8–12.

[97] Nieto Test., Hr'g Tr. Vol. II 214:21–24, Dkt. No. 80; Pl.'s Ex. 131 at 689.

[98] Nippoldt Baca Test., Hr'g Tr. Vol. III 75:7–76:3, Dkt. No. 81.

are unrelated to the crash.[99] Many young people face challenges at home; not all are struck with mental illness as a result. Before the crash, evidence shows that J.G. was a typical teenage girl; it is after the crash that she is diagnosed with these disorders.[100] It is also not persuasive to say that J.G. lacks PTSD because she lacks true flashbacks—in the sense that she has flashbacks of the crash but does not actually remember the crash itself due to amnesia.[101] What matters is that J.G. reported having traumatic triggers along with flashbacks.[102] For these reasons, the Court finds that J.G.'s mental health injuries were caused by the crash.

#### c. Neuropsychological Injuries

The parties dispute the severity of J.G.'s brain injury. The plaintiffs, relying on Dr. Parnes's testimony, categorize it as moderate.[103] In turn, the defendants, relying on Dr. Lisa Nippoldt-Baca, assert it was a mild but complicated TBI.[104] Whether a patient's TBI is mild, moderate, or severe, as noted above, is a question that depends on multiple factors.[105] The significance of the dispute is that, at the very least, a more severe case of TBI suggests permanent brain damage or an increased risk of dementia.[106]

---

[99] *See* Nippoldt Baca Test., Hr'g Tr. Vol. II 276:18–11 (disagreeing that J.G. has PTSD but agreeing that she suffers from "adjustment disorder with anxiety and depression").

[100] *See* Nieto Test., Hr'g Tr. Vol. II 86:14–89:22, Dkt. No. 80 (contrasting J.G.'s life before and after the crash).

[101] *See* Nippoldt-Baca Test., Hr'g Tr. Vol. III 132:4–17, Dkt. No. 81.

[102] *See* Def.'s Ex. 92 at 38, 45.

[103] Dkt. No. 82 at 98 (citing Parnes Test., Hr'g Tr. Vol. I 73:10–15, 104:11–15, Dkt. No. 79).

[104] Dkt. No. 83 at 8 (citing Nippoldt-Baca Test., Hr'g Tr. Vol. III 81:3–25, Dkt. No. 81).

[105] *See* Parnes Test., Hr'g Tr. Vol. I. 70:17–71:23, Dkt. No. 79

[106] *See* Nippoldt-Baca Test., Hr'g Tr. Vol. III 129:5–16, Dkt. No. 81. As Dr. Nippoldt-Baca explained, the hypothesized risk of dementia in "very severe" cases of TBI arises because of large-scale bleeding in the brain that permanently destroys portions of the brain. *Id.*

The Court finds that J.G.'s TBI was mild but complicated. That conclusion is supported by several critical facts. First, like her mother, J.G.'s Glasgow Coma Scale score at the scene of the wreck was 14.[107] Second, while the Court credits the evidence showing J.G. had two days of pre- and post-accident amnesia, the Court is persuaded that the typical case of pre-accident (also known as "retrograde") amnesia is followed by significantly longer periods of post-accident ("anterograde") amnesia.[108] That J.G.'s anterograde amnesia lasted only two days, and not a week or longer, points to a relatively mild injury. Third, the typical moderate TBI would require days of observation to handle the fallout from the injury.[109] Such a patient would present with amnesia and confusion, but the medical records do not suggest that—even if J.G. continued to suffer some memory issues after the crash—her condition was too poor to prevent her release from the hospital on the day of the crash.[110] Fourth, J.G.'s CT scan at the hospital did not identify internal bleeding in her brain.[111] While the presence of hemosiderin deposits in her brain indicates that some bleeding occurred, a more severe case of TBI would present "white matter findings" indicating that the bleeding destroyed brain tissue.[112] No such finding was present.[113]

The Court recognizes, too, that a non-permanent TBI will have symptoms that "wax and . . . wane," but "trend[]" towards recovery.[114] When brain damage is permanent,

[107] *Id.* at 81:10–24.

[108] *See id.* at 86:23–87:10.

[109] *See* Marks Test., Hr'g Tr. Vol. II 211:18–25, Dkt. No. 80.

[110] *See id.* at 212:1–10.

[111] Nippoldt-Baca Test., Hr'g Tr. Vol. III 82:13–18, Dkt. No. 81.

[112] *Id.* at 83:8–17.

[113] *Id.*

[114] Marks Test., Hr'g Tr. Vol. II 231:17–232:5, Dkt. No. 80.

recovery stalls and the impairments remain.[115] At trial, the parties contested whether J.G.'s academic performance indicates permanent brain damage. The Court finds that it does not. While J.G. struggles somewhat in school, her tests with Dr. Grandison showed that she maintained strong short-term memory and average cognitive functioning.[116] Her memory issues[117] are more likely indicative of ongoing stressors, anxiety, and depression.[118]

Accordingly, the Court finds that J.G. has recovered from her TBI. For these reasons, as well as the Court's finding regarding the link between TBIs and dementia, the Court finds that J.G. is not at a heightened risk of developing dementia as a result of the crash.

**iii. B.P.**

The final victim of the crash is B.P.

**a. Physical Injuries**

Because B.P. wore her seatbelt, she was not ejected from the vehicle.[119] But that did not spare her from injury. B.P.'s injuries were so severe that she was life-flighted to Cook Children's Medical Center in Fort Worth.[120] Doctors determined that B.P. received liver and pulmonary lacerations, a pulmonary contusion, abrasions, a pelvic fracture, and a spinal fracture.[121] B.P. remained hospitalized for the next three days.[122]

---

[115] *Cf. id.* at 232:6–21.

[116] Nippoldt-Baca Test., Hr'g Tr. Vol. III, 103:13–107: 23, Dkt. No. 81.

[117] *See* Def.'s Ex. 96 at 79–83.

[118] *See* Pieroth Test., Hr'g Tr. Vol. III 32:23–33:6, Dkt. No. 81 (noting that "pain, sleep disturbance, [and] stressors all affect cognition").

[119] Pl.'s Exs. 1 at 2; 107 at 4.

[120] Pearl Test., Hr'g Tr. Vol. II 130:10–131:3, Dkt. No. 80.

[121] *See* Pl.'s Ex. 108 at 142, 163, 206.

[122] *Id.* at 160.

B.P. continues to suffer from lasting physical pain—perhaps the most of any of the crash victims. She suffers from chronic pain, headaches, tinnitus, and multiple orthopedic injuries.[123] However, the defendant asserts that B.P. has recovered from the crash and that any ongoing physical-health challenges result from her later attempt to return to weightlifting. *See* Dkt. No. 83 at 14. To the contrary: As Dr. Goff explained, this is not the sort of injury someone receives "without a significant event" having previously damaged the same bones.[124] It is an injury that is directly traceable to B.P.'s prior injury in the crash.

That places B.P.'s ongoing pain in its proper context. While B.P. was eventually cleared for participation in sports after physical therapy,[125] she declined to return to the athletic activities she enjoyed prior to the crash. Instead, she now struggles from racking hip and back pain that makes it difficult for her to walk.[126]

**b. Injuries to Mental Health**

Following the crash, Dr. Goff diagnosed B.P. with insomnia, PTSD, and anxiety.[127] The defendant disputes that the crash caused B.P.'s mental-health problems. *See* Dkt. No. 83 at 13. The Court agrees with the defendant that there is insufficient evidence to conclude B.P. suffers from PTSD, particularly given that there is no discussion in the record of flashbacks or nightmares.[128]

---

[123] *See* Goff Test., Hr'g Tr. Vol. I 214:6–216:9, Dkt. No. 79.

[124] *Id.* at 211:4–8.

[125] Goff Test., Hr'g Tr. Vol. II 41:21–42:6, Dkt. No. 80.

[126] *See* Vincent Young Test., Hr'g Tr. Vol. II 111:13–112:13, Dkt. No. 80.

[127] Goff Test., Hr'g Tr. Vol. I 177:24–178:7, Dkt. No. 79.

[128] *See* Nippoldt-Baca Test., Hr'g Tr. Vol. III 150:24–151:7, Dkt. No. 81.

The defendant also tries to shift the source of B.P.'s mental-health problems to her "turbulent family situation" and separation from her mother earlier in life.[129] And, once more, a defense witness suggested that all of this is to blame on teenage hormones.[130] But just as with the defendant's questioning of J.G.'s mental-health injuries, the Court cannot agree. Whatever challenges B.P. might have had growing up, she was described by those who knew her best as "very outgoing, happy, [and] always willing to help."[131] She also shared a close bond with her father, who testified that he and B.P. enjoyed golfing and boating together.[132]

After the accident, B.P. developed anxiety disorder, insomnia, and "cognitive, emotional, and behavioral" issues.[133] B.P. was once active and organized; she is now lethargic and disorganized.[134] Once inclined towards being upbeat, she is now prone to mood swings and irritability.[135] And while every teenager has some tendency towards personality changes, the fact remains that B.P. is "constantly [in] pain" and that these changes arose immediately after the accident.

Though the Court finds below that B.P. has recovered from her TBI, that does not mean her mental-health issues are any less real. And, for the reasons above, the Court finds

---

[129] *See* Pearl Test, Hr'g Tr. Vol. II 136:24–137:11, Dkt. No. 80; Def.'s Closing Statement, Hr'g Tr. Vol. III 277:7–10, Dkt. No. 81.

[130] Nippoldt-Baca Test, Hr'g Tr. Vol. III 75:7–76:3, Dkt. No. 81.

[131] *See* Rebecca Young Test., Hr'g Tr. Vol. II 117:8–20, Dkt. No. 80.

[132] Pearl Test., Hr'g Tr. Vol. II 128:5–129:19, Dkt. No. 80.

[133] Goff Test., Hr'g Tr. Vol. I 205:25–206:9, Dkt. No. 79 (anxiety and insomnia); *id.* at 214:3–13 (attributing B.P.'s emotional and behavioral issues to her TBI).

[134] *See* Pearl Test., Hr'g Tr. Vol. II 132:11–133:17, Dkt. No. 80 (contrasting B.P.'s tidiness before and after the crash).

[135] *Id.* at 134:17–20 (discussing mood swings); Parnes Test., Hr'g Tr. Vol. I 75:18–76:3, Dkt. No. 79 (discussing irritability).

that B.P.'s anxiety, insomnia, and cognitive, behavioral, and emotional issues were caused by the February 2023 crash.

**c. Neuropsychological Injuries**

Last are B.P.'s injuries relating to her TBI. B.P. suffered an uncomplicated mild TBI, with a Glasgow Coma Scale score of 14 and a loss of consciousness.[136] Once again, the critical contentions here are whether B.P.'s TBI is permanent and whether she is at an increased risk of developing dementia as a result of the crash.

B.P. does not continue to suffer from her TBI. While the Court does not discount the testimony as to B.P.'s loss of interest in pre-crash activities, or her increased messiness and forgetfulness at home, or the need to work harder than before to succeed in school, these problems can be attributed to the crash without the conclusion that they are the product of a TBI. Simply put, B.P. continues to suffer physically, mentally, and emotionally from the crash. Such stressors are known to contribute to cognitive issues and forgetfulness.[137] While the Court heard testimony at trial of B.P.'s forgetfulness—in one incident, telling the same story to her father twice in the span of ten minutes—the Court is unpersuaded that this is the result of a permanent TBI rather than the product of forgetfulness from mental-health issues or (in that instance) distraction from the use of a cellphone.[138] And while it is possible for a mild TBI to have lasting effects, the Court lacks sufficient evidence before it to show that B.P.'s mental state has entered a state of

[136] Pl.'s Exs. 107 at 4; 125 at 11. Dr. Parnes estimated that B.P.'s score at the time of the crash as 13, but agreed the concussion was mild. Parnes Test., Hr'g Tr. Vol. I 72:14–19, Dkt. No. 79.

[137] *See supra* n.118.

[138] Pearl Test., Hr'g Tr. Vol. II 133:23–134:11, Dkt. No. 80.

permanent decline.[139] Thus, it cannot conclude that she continues to suffer from her TBI. For that reason, as well as for the reasons discussed above, the Court cannot conclude that B.P. is at an increased risk of dementia.

#### iv. Ryan Pearl

B.P.'s father, Ryan Pearl, is also a plaintiff in this case. Since he was not in the crash, he did not suffer any physical injuries. While Pearl presented some testimony relating to his own pain and suffering, mental anguish is not an independent ground of recovery. *See Boyles v. Kerr*, 855 S.W.2d 593, 596 (Tex. 1993). Thus, Pearl did not suffer any recoverable injury as a result of the crash.

## 2. Conclusions of Law

### A. Legal Standards

The plaintiffs' claim arises under the FTCA. They allege that Everitt's "failure to yield the right of way, failure to keep a safe speed, and failure to keep a proper lookout before entering [FM 765] negligently caused the collision at issue." Dkt. No. 66 at 4. "Under federal law, suits against the United States must be tried by the district court itself . . . apply[ing] the substantive law of the state where the alleged negligence occurred," and "to the extent state law is not precluded by federal law." *Le II*, 138 F.4th at 272.

In Texas, "a plaintiff must establish each of the following elements by a preponderance of the evidence": "(1) that the defendant owed the plaintiff a specific duty; (2) that the defendant breached that duty; (3) that the breach caused the plaintiff's injuries; and (4) that the plaintiff suffered damages as a result of his injuries." *Le v. United States*,

---

[139] *See* Hatfield Test., Hr'g Tr. Vol. III 54:1–4, Dkt. No. 81 (observing that "there was no indication" from B.P.'s individual education plan "indicat[ing] that she would need any support going forward").

No. 4:22-CV-147, 2023 WL 4708003, at *7 (N.D. Tex. July 24, 2023) (*Le I*) (citing *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)).

Relevant here, Texas law provides two pathways for the defendant to reduce or avoid liability despite the defendant's own negligence: contributory negligence and third-party responsibility. First, the defendant urges that Nieto cannot recover due to her failure to wear a seatbelt. This argument sounds in contributory negligence. *See In re Gamble*, 676 S.W.3d 760, 780–81 (Tex. App.—Forth Worth 2023, no pet.) (discussing *Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553 (Tex. 2015)). Texas's contributory-negligence regime provides that "if a defendant can prove that a plaintiff's own negligent conduct contributed to his injuries by more than fifty percent, the plaintiff is barred from recovering any damages from the defendant." *Le I*, 2023 WL 4708003, at *8 (citing Tex. Civ. Prac. & Rem. Code § 33.001). "If the plaintiff's degree of contributory negligence is less than fifty percent, however, his recovery is simply reduced by his own proportional percentage of negligence." *Id.* (citing Tex. Civ. Prac. & Rem. Code § 33.003). As regards the seatbelt claim, the defendant must show that "usage of a seatbelt would have reduced" Nieto's injuries. *Le II*, 138 F.4th at 277.

Second, the defendant may designate a responsible third party; that is, "any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought," including by negligence or the violation of an applicable legal standard. Tex. Civ. Prac. & Rem. Code § 33.011(6). The defendant bears the burden of proof. *See Le I*, 2023 WL 4708003, at *19.

The Court previously issued an order addressing whether the defendant could designate three responsible third parties: the City of San Angelo, Tom Green County, and

TxDOT. *See* Dkt. No. 55. Because the parties agreed that the City was not responsible, the Court struck the City as a designated third party; it denied the remainder of the motion. *See id.* at 6. In interpreting the Texas third-party-responsibility statute, the Court explained that a designated third party "must possess a legal duty in order to be held responsible." *Id.* at 8 (citing *In re Eagleridge Operating, LLC*, 642 S.W.3d 518, 529–30 (Tex. 2022)). The Court further held that a third party may be held responsible if it engages either in "common-law negligence *or* [by] violating a legal duty," whether or not the third party is immune under the Texas Tort Claims Act. *Id.* at 11 (emphasis in original).

### B. Negligence

The Court concludes that the defendant is liable for Everitt's negligence on February 12, 2023.

#### i. Duty of Care and Breach

First, Everitt had a duty of care as a motorist. That means obeying the "rules of the road," such as by yielding the right of way,[140] keeping a proper lookout,[141] and maintaining a safe speed.[142]

Second, Everitt breached her duty of care. A reasonable person keeps his or her eyes on the road; he recognizes that—particularly on a country lane—intersections may appear at any time; he takes appropriate caution. Everitt did none of this. She failed to pay attention to the road, failed to see the yellow stop-ahead sign, failed to notice the power lines and crisscrossing traffic, and drove into the intersection at 41 miles per hour. In doing

---

[140] *In re Windstar Trucking, LLC*, 657 S.W.3d 474, 485 (Tex. App.—El Paso 2022, orig. proceeding); *see also* Tex. Transp. Code §§ 542.301, 542.401.

[141] *Montes v. Pendergrass*, 61 S.W.3d 505, 509 (Tex. App.—San Antonio 2001, no pet.).

[142] *Adams v. Morris*, 584 S.W.2d 712, 717 (Tex. App.—Tyler 1979, no writ).

so, she failed to obey the rules of the road, yield the right of way, keep a proper lookout, and maintain a safe speed.

**ii. Causation**

Third, Everitt is both the cause-in-fact and proximate cause of the crash. But for her failure to drive with care and attention, she would not have entered FM 765 at full speed and would not have collided with Nieto's minivan. Everitt's conduct is thus the cause-in-fact of all of the crash victims' injuries. Her conduct is also the proximate cause of those injuries, because "a person of ordinary intelligence should have anticipated the danger" of the victims' various injuries by ramming a postal van into Nieto's vehicle at full speed. *Le I*, 2023 WL 4708003, at *9 (quoting *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016)). Unsurprisingly, "the need for subsequent medical treatment . . . as a result of injuries incurred during a car accident has historically been considered foreseeable under Texas law." *Id.* at *9 (citing *Henley v. Crawford*, No. 4-07-104-CV, 2008 WL 34734, at *5 (Tex. App.—San Antonio Jan. 2, 2008, no pet.) ("Medical treatment following a motor vehicle accident is certainly foreseeable, as is the fact that such treatment may or may not be successful.")).

The defendant offers several rebuttals to causation, which the Court considers in turn.

**a. No other party is responsible for the crash.**

First, the defendant insists that Everitt's "negligence in this matter was less than [a] 50% cause of this accident" and that "the collision was primarily caused by the failure of TxDOT to maintain the stop sign at the intersection of Olsak Road and FM 765." Dkt. No. 83 at 20. While the defendant's amended proposed findings of fact and conclusions of law

appear to abandon the theory that Tom Green County was responsible, *see generally* Dkt. No. 55, the Court considers that contention as well.

To hold either Tom Green County or TxDOT responsible, the defendant must establish that these entities committed negligence, either by breaching a common-law or statutory duty. *Id.* at 11; *see In re Eagleridge Operating, LLC*, 642 S.W.3d at 529–30. Because the Court finds that Everitt was either not looking at the road or was completely distracted at the wheel, and because the Court finds that Everitt's conduct would not have been changed by the presence of the stop sign, the defendant fails to establish that either entity was a cause-in-fact of the collision.

Even if the presence of the stop sign would have changed Everitt's reaction, neither Tom Green County nor TxDOT could be held responsible. The evidence produced failed to show that Tom Green County had a duty of care. Texas common law generally only creates a duty of care for property owners who create hazardous conditions off-premises or who have a statutory duty of care, and Tom Green County has neither. *See Bell v. Cain*, No. 06-23-060-CV, 2024 WL 1203896, at *4, 6 (Tex. App.—Texarkana Mar. 21, 2024, no pet.); *In re County of Nueces*, 814 S.W.2d 91, 94 (Tex. App.—Corpus Christi 1991, writ denied) (requiring "exclusive control" for TTCA liability).

As for TxDOT, the defendant can only prevail if it establishes "actual or constructive" notice. *See, e.g.*, *Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.

1998).[143] Because the Court does not credit Galindo's testimony, there is no evidence TxDOT had actual notice of the missing stop sign. The defendant could prevail if TxDOT had constructive notice. Constructive notice means the sort of "facts and circumstances [that give] rise to a reason for a governmental unit to know of a given absence . . . of a traffic or road sign." *McKnight v. Calvert*, 539 S.W.3d 447, 455–56 (Tex. App.—Houston [1st Dist.] 2017, pet. denied.). However, the defendant does not contend TxDOT had constructive notice, and no evidence establishes constructive notice. There is no evidence, for instance, that TxDOT officials routinely drove through the area or otherwise had a "reason to know" of the stop sign's absence. *Id.* at 456 (discussing *Kenneally v. Thurn*, 653 S.W.2d 69, 72 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.)).

**b. Nieto is not contributorily negligent for her injuries by failing to wear a seatbelt.**

Separately, the defendant contends that Nieto cannot recover due to her failure to wear a seatbelt. The Texas Supreme Court observes that "a plaintiff who breaks the law or otherwise acts negligently by not using a seat belt is at least partially responsible for the harm that befalls him." *Nabors*, 456 S.W.3d at 562. However, "this common-sense approach" also requires the defendant to show that "the failure to buckle up exacerbated [the plaintiff's] injuries." *Id.*; *Le II*, 138 F.4th at 277. True, as the defendant urges, expert testimony is not required to prove seatbelt nonuse caused Nieto's injuries. *See Narbo*, 456

---

[143] As the Court explained in its order granting summary judgment in part, "the TTCA does not preclude *responsibility*, even if it precludes liability." Dkt. No. 55 at 10 (emphasis in original). Thus, although a claim against TxDOT itself arising under the TTCA only permits actual notice, the Court may consider responsibility under a theory of constructive notice. *See* Tex. Civ. Prac. & Rem. Code § 101.060(a)(3); *Tex. Facilities Comm'n v. Speer*, 559 S.W.3d 245, 251 (Tex. App.—Austin 2018, no pet.) (noting that neighboring subsection (a)(2) permits a theory of constructive notice).

S.W.3d at 563. And in considering the evidence, the Court by no means discounts "the basic laws of physics." Dkt. No. 83 at 21.

However, as addressed above, the evidence produced by the parties amounts to an acknowledgment that J.G. and Nieto were unbuckled and ejected from the car, but ultimately suffered broadly similar injuries to B.P., who stayed buckled in. On these facts, the Court cannot conclude that Nieto's injuries were exacerbated by a failure to wear her seatbelt. Without sufficient evidence of causation in fact, Nieto cannot be held contributorily negligent.[144]

**c. J.G. and B.P.'s later injuries do not break causation.**

Finally, the defendant raised evidence at trial suggesting that, to the extent J.G. and B.P. continue to suffer from physical and neuropsychological issues as a result of the crash, it is not responsible due to intervening injuries that happened at a later date. As noted above, B.P. later injured herself performing a squat exercise at school. J.G. has since been in several subsequent car crashes (none of which required hospitalization) and was concussed by a falling Jenga block at a party.[145]

These events fail to break the causal chain. As for J.G.'s subsequent accidents, the fact that each accident was minor, combined with evidence of J.G.'s continuing pain following the February 2023 crash, does not suggest her ongoing problems have been

---

[144] J.G. also cannot be held contributorily negligent, nor can her damages be reduced, on account of her mother's failure to ensure she was wearing her seatbelt. *See Ruff v. Univ. of St. Thomas*, 582 S.W.3d 707, 715 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) ("[P]arental immunity prohibits any reduction in the damages to be awarded to [the minor] due to any fault apportioned to [her parents] . . . ."); *see also* Def.'s Closing Statement, Hr'g Tr. Vol. III 283:25–284:3, Dkt. No. 81 (conceding that J.G.'s damages cannot be reduced).

[145] *See* Nieto Test., Hr'g Tr. Vol. II 82:18–84:14, 100:13–102:20, Dkt. No. 80 (Jenga incident); *id.* at 89:23–91:5, 100:14–101:9 (subsequent crashes).

exacerbated by these subsequent accidents. These are far and away from the facts that "intervene[] between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016) (quotation omitted) (alteration in original).[146] A similar conclusion follows for the Jenga incident: because the Court finds that J.G. is not suffering permanent symptoms related to her TBI, the Court necessarily finds, too, that the Jenga incident did not result in, or exacerbate, permanent TBI symptoms.

As for B.P.'s squat injury, it fails to reduce or eliminate responsibility because it is a "concurring cause," which means that it is a product of "the continuing and co-operating original negligence in working the injury, leaving the causal connection between the defendant's negligence and the plaintiff's harm intact." *Id.* at 98 (quotation omitted). B.P.'s squat injury, as noted above in the Court's findings, would not have happened without the preexisting harm worked on her body by the car crash.

**iii. Damages**

Having identified the injured plaintiffs' injuries, the Court must now consider the damages owed to the plaintiffs. The parties present dueling lifecare plans and dispute whether the victims suffer from a loss of earning capacity. They have stipulated, however, that certain award amounts are appropriate if the Court adopts a given plan in full. *See* Dkt. No. 67. The Court considers the parties' stipulation, as well as all other relevant evidence.

---

[146] In arguing for judgment as a matter of law, the defendant emphasized that two of J.G.'s subsequent accidents totaled the vehicle. *See* Oral Arg. on Def.'s Mot. for J. As a Matter of Law, Hr'g Tr. Vol. II 148:25–149:21, Dkt. No. 80. But a car does not need to be in a violent collision to be totaled. For example, in one of the incidents, J.G. backed into a light pole, causing the trunk to press on the tires and thus totaling the vehicle. Nieto Test., Hr'g Tr. Vol. II 104:10–14, Dkt. No. 80. Again, the Court is unpersuaded that either of these accidents break the causal chain.

**a. Past Medical Expenses**

"To recover for past medical expenses, a plaintiff must prove that the expenses were necessary to treat the injury, were reasonable in amount, and the expenses were paid or incurred by or on behalf of the plaintiff." *Le I*, 2023 WL 4708003, at *11 (citing Tex. Civ. Prac. & Rem. Code § 41.0105). The parties disagree as to the amount owed for each of the crash victims. The Court finds that the estimates provided in the plaintiffs' proposed findings of fact and conclusions of law are the correct amounts. The defendant's amounts rely on the testimony of Dr. Piper.[147] But as the plaintiffs correctly note, the amounts offered by Dr. Piper are inconsistent with the sum of amounts derived from billing.[148] The Court finds that the plaintiffs have demonstrated that all claimed past medical expenses were, to a reasonable degree of medical certainty, proximately caused by the collision at issue. The identified medical expenses were reasonable and necessary. Thus, the Court adopts the plaintiffs' estimate of past medical damages and concludes the plaintiffs' damages are as follows:

- Nieto: $56,707.04;
- J.G.: $25,666.98;
- B.P.: $122,839.00.[149]

---

[147] *See* Dkt. No. 83 at 29; Piper Test., Hr'g Tr. Vol. III 197:21–198:6, 199:23–200:3, 210:22–211:2, Dkt. No. 81

[148] *See* Dkt. No. 82 at 130–33 (collecting exhibits).

[149] The defendant seeks a finding on whether the plaintiffs could recover "any past medical expenses other than those actually paid or incurred." Dkt. No. 66 at 6. Because the plaintiffs' proposed findings and conclusions seek, and because the Court awards, recovery in the amount actually paid, it is unnecessary to address this question.

**b. Future Medical Expenses**

"To recover for future medical expenses, a plaintiff must show that there is a 'reasonable probability' that the expenses resulting from the injuries he sustained will be necessary in the future and the reasonable cost of such care." *Le I*, 2023 WL 4708003, at *11 (quoting *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)). "Such damages must be more than 'speculative or purely conjectural' to justify a court's award," but certainty is not required. *Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co.*, 324 F. Supp. 3d 808, 825 (E.D. La. 2018) (quoting *Mainster v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991)). In calculating the amount of future medical expenses, the Court may consider "(1) the injuries suffered; (2) the medical care rendered before trial; (3) the injured party's progress toward recovery under the treatment received; and (4) the condition of the injured party at trial." *Le I*, 2023 WL 4708003, at *11 (citing *Rosenboom*, 995 S.W.2d at 828).

The parties' evidence on the subject of future medical expenses revolves around three interrelated questions: (1) whether the crash victims suffer and will continue to suffer from their initial TBIs; (2) whether the crash victims are at an increased risk of developing dementia; and (3) which of the parties' competing experts on long-term medical care—Dr. Goff for the plaintiffs and Dr. Piper for the defendant—is ultimately persuasive. The Court has already addressed the first two questions and answered in the negative. Because the victims do not continue to suffer from their TBIs and are not at risk of developing dementia because of the accident, the Court concludes damages related to those asserted conditions are not warranted.

Thus, the Court now turns to the dueling experts. Dr. Goff's cost calculation rested upon the 80th percentile of costs for treatment, which is the "[u]sual, customary, and reasonable" amount in the field of care planning.[150] Dr. Goff discussed the nature of Nieto's injuries and testified that he had experience with long-term planning for patients with similar orthopedic injuries.[151] While the Court finds Dr. Goff credible, portions of his testimony evidenced that his recommended care plan was excessive. The Court ultimately finds that Dr. Piper's findings are more credible.

**1. Dr. Goff's recommendations as to J.G.'s treatment with Wellbutrin XL and as to dental care are excessive.**

First, in relation to J.G.'s mental health needs, Dr. Goff recommended a brand-name antidepressant—Wellbutrin XL—even though the generic form of the drug was "dramatic[ally]" cheaper.[152] As Dr. Piper noted in his testimony, the brand-name's cost alone would account for over $1 million in additional lifetime costs.[153] While Dr. Goff's recommendation is not unreasonable, given that J.G. is prescribed Wellbutrin XL,[154] he did not elaborate on whether brand-name Wellbutrin XL is materially different for treating depression than the generic form.[155] And while the Court agrees Dr. Piper is "not a physician and [is] unqualified to testify about the pharmacological differences between a brand name and generic brand," the lack of evidence from either side on the material

[150] Goff Test., Hr'g Tr. Vol. I 197:11–24, Dkt. No. 79; *see also id.* at 198:14–17

[151] *See id.* at 221:8–224:18.

[152] *See id.* at 237:1–18.

[153] Piper Tes.t, Hr'g Tr. Vol. III, 190:5–14, Dkt. No. 81.

[154] Pl.'s Ex. 131 at 648.

[155] *See* Goff Test., Hr'g Tr. Vol. I 79:3–12, Dkt. No. 79.

distinction between the two does not counsel in favor of adopting a far more expensive brand name whose effects may be materially identical to the generic form.[156]

Second, for J.G.'s dental needs, Dr. Goff recommends annual dentist visits for the rest of J.G.'s days.[157] He makes this recommendation even though he already recommends that J.G. receive some damage award to compensate for future dental composite fracture repairs.[158] The Court is not persuaded that, for want of a natural tooth, J.G. must *now* start going to the dentist and receiving care when the norm is for her to have done so anyway.[159] Because artificial teeth may require future repair, Dr. Goff's inclusion of dental repair every ten years are necessary; the remaining dental recommendations are not.

**2. Dr. Piper's calculation of costs is the most persuasive estimate of costs.**

Next is the contrast between the cost analyses used by Dr. Goff and Dr. Piper. The former searched for the "usual, customary, and reasonable charges."[160] A charge is "usual" in that it is "usually charged for a given service by an individual physician to their private patient"; it is "customary" if "it is within the range of usual fees currently charged by physicians of similar training and experience for the same service within the same specific and geographical area"; and it is reasonable if it "is justifiable considering the special circumstances of the particular case without regard to payments that have been discounted

[156] Dkt. No. 82 at 105; *see* Goff Test., Hr'g Tr. Vol. I 237:1–10, Dkt. No. 79 (comparing Wellbutrin XL to Zoloft and emphasizing that Wellbutrin XL was selected simply because it was "already . . . prescribed to [J.G.]").

[157] Pl.'s Ex. 75 at 3.

[158] *Id.* at 4.

[159] *See* Goff Test., Hr'g Tr. Vol. II 35:7–10, Dkt. No. 80 (recommending that everyone should generally "see a dentist at least annually").

[160] Goff Test., Hr'g Tr. Vol. I 195:4–11, Dkt. No. 79.

under governmental or private plans."[161] Dr. Goff's "UCR" method relied on the method provided by the American Medical Association, and determined cost with reference to the 80th percentile charge.[162]

Whereas Dr. Goff's UCR method looked to the fees typically charged for treatment, Dr. Piper's approach was more narrow. His "reasonable value" approach asked "what [amount], more likely than not, would providers in this medical market accept as payment in full for their service."[163] In other words, rather than review "the sticker price," Dr. Piper considered the amount that "is actually transacted for [similar] healthcare" in the typical case.[164] Dr. Piper's method determined which payments were reasonable (like Dr. Goff, in the 80th percentile) by reviewing relevant healthcare literature discussing actual payments to providers.[165]

The plaintiffs object to Dr. Piper's method on several grounds. First, they contend that his testimony is barred by the collateral source rule. *See* Dkt. No. 82 at 113–17. "The collateral source rule bars a wrongdoer from offsetting his liability by insurance benefits independently produced by the injured party." *Mid-Century Ins. Co. of Tex. v. Kidd*, 997 S.W.2d 265, 274 (Tex. 1999). Said differently, "it precludes a tortfeasor from obtaining the benefit of, or even mentioning, payments to the injured party from sources other than the tortfeasor." *Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 626 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). Specifically, the plaintiffs assert that Dr. Piper's "methodology

[161] *Id.* at 194:16–196:6.

[162] *Id.* at 194:12–15, 197:3–198:17.

[163] Piper Test., Hr'g. Tr. Vol. III 186:17–187:6, Dkt. No. 81.

[164] *Id.*

[165] *Id.* at 187:7–188:12.

violates this principle because his 'reasonable value' approach to reducing future medical costs rests entirely on insurance-negotiated rates, Medicare allowable rates, and commercial payer benchmarks," which is "precisely the collateral source evidence Texas law bars." Dkt. No. 82 at 114 (emphasis omitted). If that is correct, then the Court must disregard Dr. Piper's recommendations where they rely on this impermissible evidence. *See Tate v. Hernandez*, 280 S.W.3d 534, 542 & n.1 (Tex. App.—Amarillo 2009, no pet.) (Campbell, J., concurring) (discussing evidentiary component of the collateral source rule).

But the Court disagrees. At trial, Dr. Piper was asked: "Does a person need insurance in order to pay the reasonable value for healthcare instead of the billed charge?"[166] At length, he explained that the answer was "no," and that a patient often could receive a reduced rate simply by speaking with their chosen healthcare provider, or by shopping between providers.[167] To be sure, Dr. Piper acknowledged that having insurance is "the easiest way" to get a reasonable value, but expressly declined to rest his methodology on the presence of insurance availability.[168] In other words, his methodology, though cognizant that some patients will reach a reasonable market value through the benefit of insurance, determined that value without resorting to the presence of insurance as a factor in his ultimate calculation. It is by no means "another way of saying insurance value." Dkt. No. 82 at 117.

Because Dr. Piper's methodology does not depend on insurance rates, the Court is satisfied that it is sound with respect to the collateral source rule. The purpose of that rule is

[166] *Id.* at 214:2–3.

[167] *Id.* at 214:4–216:1.

[168] *Id.* at 216:2–8.

to prohibit a tortfeasor's windfall from permitting them to escape paying for that which they would otherwise be obliged to pay. *See Haygood v. De Escabedo*, 356 S.W.3d 390, 395 (Tex. 2011). But without an obligation, there is no prohibition. *See id.* For that reason, future medical expenses include only those payments that are "reasonable" in cost. *Le I*, 2023 WL 4708003, at *11 (quoting *Rosenboom*, 995 S.W.2d at 828).

Here, Dr. Piper's methodology accounts for market reality: While a hospital *could* charge exorbitant amounts in an unbending manner, most compromise and work with their patients. Awarding damages on the assumption that the plaintiffs' chosen hospital, or all local hospitals, will charge sticker price and refuse to come down is not a reasonably probable scenario, and awarding damages on that assumption would provide the plaintiffs—not the defendant—with a windfall. *See Haygood*, 356 S.W.3d at 395; *Daughters of Charity Health Servs. of Waco v. Linnstaedter*, 226 S.W.3d 409, 412 (Tex. 2007). Thus, the collateral source rule does not implicate Dr. Piper's methodology or conclusions.[169]

Second, the plaintiffs attack Dr. Piper's methodology—even if admissible—as "speculative" and "conclusory." Dkt. No. 82 at 116–17. Why? Because it "defies common sense" to think that patients can negotiate their rates down with a little proactive behavior,

---

[169] The plaintiffs further assert that, "[r]ecently, a Texas court excluded Dr. Piper's opinions for using the same methodology he uses here." Dkt. No. 82 at 115 (citing Order on Pl.'s Mot. to Exclude, *In re KCMO Litig.*, No. 2019-77820 (11th Jud. Dist. Ct. Harris Cnty., Tex. Apr. 17, 2023)). The implication is that Dr. Piper's testimony was excluded there because it violated the collateral source rule. *See id.* at 115 (discussing collateral-source-related problems immediately before and after discussing *In re KCMO Litigation*). The *KCMO* order is unreasoned, but the briefing in that case does not suggest the issue of collateral source evidence predominated. The plaintiffs' motion in *KCMO* centered on Dr. Piper's methodology, and only briefly noted that the letters of protection cited in his methodology contradicted the doctrine. *See* Pl.'s Mot. to Exclude at 7, *In re KCMO Litig.*, No. 2019-77820 (11th Jud. Dist. Ct. Harris Cnty., Tex. Mar. 3, 2023). In short, the problems raised in that case are not present here and do not persuade the Court to conclude that Dr. Piper's testimony is less reliable or unreliable.

and the Court should not to consider Dr. Piper's own personal experience in securing lower rates for his family. *Id.*

None of these points are persuasive. Dr. Piper testified that these reasonable rates exist without regard to the backing of insurance companies, and he reached this conclusion after reviewing market research and data.[170] He stated that patients have paid and do pay for the reasonable value even without the presence of insurance backing.[171] If Dr. Piper is one such patient, then so be it, but the Court does not rely on his personal testimony. The Court finds that Dr. Piper is credible and that his review of medical literature reveals a grounded, non-speculative analysis of payment data that proves persuasive.

Third, the Court is not persuaded by the plaintiffs' argument that they are in a worse negotiating state than the average patient in light of their TBIs. *See* Dkt. No. 82 at 117. The Court finds that no plaintiff suffers from ongoing brain damage. And to the extent the plaintiffs seek to undermine the methodology in light of their mental health challenges and the impact of those conditions on cognition, the evidence does not establish that they are any less capable of negotiating prices than the average patient.

In sum, the Court is unpersuaded by the plaintiffs' objections to Dr. Piper's methodology. Having reviewed the reports of each doctor, the Court finds Dr. Piper's testimony to be more credible than Dr. Goff's because the reasonable market value estimate most accurately approximates "the reasonable cost" of future necessary medical care. *Le*, 2023 WL 4708003, at *11 (citing *Rosenboom*, 995 S.W.2d at 828).

---

[170] *See* Piper Test., Hr'g Tr. Vol. III 187:7–188:12, Dkt. No. 81.

[171] *Id.* at 214:4–216:1.

**3. Attendant care owing to cognitive decline is not reasonably likely to be necessary here.**

One final point: Dr. Goff and Dr. Piper part ways over the means of securing professional attendant care for each individual plaintiff as they age. But the Court need not determine which witness has the stronger recommendation as no such care is necessary. Dr. Goff testified that "the attendant care [was] primarily driven by the cognitive issues"—that is, the permanent TBIs—each patient purportedly suffered.[172] Indeed, when discussing B.P.'s attendant care, Dr. Goff explained that he "would not have included attendant care" for B.P.'s orthopedic injuries alone.[173] Rather, his concern was ensuring that each victim's anticipated cognitive decline would not require institutionalization or an improper burden upon their families.[174] In light of this concession and the Court's finding that no victim suffers from permanent brain damage or an increased risk of cognitive decline owing to their TBIs, damages are not appropriate for securing attendant care.[175]

* * *

Given the above, the Court concludes that Dr. Piper's method and testimony were the most persuasive exposition of the plaintiffs' future medical damages. Dr. Piper presented two lifecare plans: modified plan 3.1, which performs a reasonable-value analysis on the items included in Dr. Goff's plan, and modified plan 4.1, which performs a reasonable-value analysis based on the defense experts' estimates.[176] That said, plan 4.1 did

---

[172] Goff Test., Hr'g Tr. Vol. I 245:6–9, Dkt. No. 79.

[173] *Id.* at 230:10–16.

[174] *Id.* at 230:20–231:2.

[175] The Court notes that the defendant did not address this issue in its trial brief but asserted during its examination of Dr. Piper that such relief was inappropriate. *See* Piper Test., Hr'g Tr. Vol. III 207:15–208:8, Dkt. No. 81.

[176] *See* Dkt. No. 91; *see also* Dkt. No. 67 at 1–3; Def.'s Exs. 142; 143; 144.

not remove any recommendation for treating the crash victims' orthopedic injuries as described by Dr. Goff, even though the parties' witnesses disputed the lasting nature of those injuries.[177]

The parties stipulate that each plan, if adopted in full, is worth a certain value. *See* Dkt. Nos. 67 at 1–3; 91 at 2 (noting that Dr. Piper made modifications to plan 3.1 in his trial testimony). Having reviewed the record, the Court determines that Dr. Piper's modified plan 4.1 most accurately reflects the future medical damages suffered by the victims. The Court adopts the plan with one modification: Because the record does not adequately clarify whether Dr. Goff's dental recommendations are included, the Court adopts Dr. Goff's recommendation for decennial dental repair, reduced by 25%, to approximate the reasonable value of that care.[178]

These amounts are not speculative and "reflect the reasonable probability that the expenses resulting from the injuries [the plaintiffs] sustained will be necessary in the future," as well as "the reasonable cost of such care." *Le I*, 2023 WL 4708003, at *11 (quotation omitted). Thus, the plaintiffs' future medical damages are as follows:

- Nieto: $166,222;
- J.G.: $213,306.18;
- B.P.: $262,918.

**c. Future Loss of Earning Capacity**

The plaintiffs further seek damages for J.G. and B.P.'s loss of earning capacity. "Lost earning capacity is an assessment of the plaintiff's capacity to earn a livelihood prior

---

[177] Piper Test., Hr'g Tr. Vol. III 212:5–9, Dkt. No. 81.

[178] *See* Pl.'s Ex. 75 at 4

to injury and the extent to which the injury impaired that capacity." *Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 640 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). "There must be some evidence that the plaintiff had the capacity to work prior to the injury and that [said] capacity was impaired as a result of the injury." *Id.* at 641. The parties have stipulated to certain damage awards if the Court adopts the recommendations of the plaintiffs' expert, Dr. Andrea Braford, in full and without modification. *See* Dkt. No. 67 at 4–5. In its proposed findings and conclusions, the defendant urges, however, that the plaintiffs have failed to prove any damages at all. Dkt. No. 83 at 31–32.

Dr. Bradford evaluated both J.G. and B.P. personally.[179] In evaluating B.P., Dr. Bradford spoke with B.P. and reviewed her medical records.[180] She determined that B.P. was not capable of attaining her dreams of nursing owing to "her physical limitations . . . as well as the other decreased attentiveness, mood, [and] psychological conditions, including her PTSD and anxiety."[181]

The Court adopts Dr. Bradford's plan in full as to B.P. True, the Court finds that B.P. does not continue to suffer from a TBI. The Court also finds that there is insufficient evidence to conclude B.P.'s mental health struggles would prevent her from obtaining the nursing degree she desires, particularly if B.P. receives proper mental health treatment as accounted for in the Court's award of future medical damages. The Court finds, however, that it is more likely than not that B.P. will be unable to become a nurse due to her physical injuries alone. Nursing is a bodily taxing job that requires walking, lifting, standing, and

[179] Bradford Test., Hr'g Tr. Vol. I 151:17–152:3, Dkt. No. 79.

[180] *Id.* at 155:16–166:16.

[181] *Id.* at 157:6–17.

sudden movement. In light of the testimony regarding B.P.'s continued physical pain and need for orthopedic treatment, the Court finds that Dr. Bradford's testimony is credible and persuasive and thus adopts her recommendation as to B.P. in full.

In evaluating J.G., however, Dr. Bradford primarily focused on J.G.'s TBI. She testified that J.G.'s neurological damage would make it "difficult[]" to "attain her goals of higher education.[182] When prompted, Dr. Bradford acknowledged that she considered J.G.'s physical maladies, but she failed to clarify how they played into her evaluation of J.G.'s earning capacity.[183]

The Court cannot find sufficient evidence to establish that J.G. suffers a loss of earning capacity. The key distinction here is one of career choices. The record demonstrated that B.P. intended to be a nurse before the crash, while J.G. wants to be a cosmetologist and attend business school.[184] There is no evidence that J.G.'s physical injuries prevent her from being a cosmetologist, nor that her injuries would render it more likely than not that she would be unable to secure a business degree. The basis of Dr. Bradford's findings comes down to the incorrect conclusion that J.G. suffers from permanent brain damage, contrary to the Court's findings. Thus, damages for loss of earning capacity are unwarranted as to J.G.

Last, the plaintiffs' original trial brief sought loss of household services for Nieto. *See* Dkt. No. 52 at 20. Relatedly, the defendant seeks a finding on whether Nieto has suffered a loss of earning capacity. Dkt. No. 66 at 13. The evidence at trial establishes that Nieto later

---

[182] *Id.* at 162:22–163:7.

[183] *Id.* at 163:8–21.

[184] *Id.* at 162:4–7.

went on to secure a bachelor's degree and holds a "similar" job to the one she held before the accident.[185] As explained above, *supra*, Findings of Fact § 1(D)(i)(d), Nieto has recovered from her TBI and is not at risk of developing dementia. And there is no evidence in the record "as to how much time [she cannot] assist with household chores," or any "economic value assessment" of that lost time, or any economic assessment addressing the loss of future income. *See* Dkt. No. 83 at 32. Because there is insufficient evidence demonstrating that Nieto has lost earning capacity or household services, damages are inappropriate as to Nieto.

Relief is awarded as follows:

- Nieto: $0
- J.G.: $0;
- B.P.: $1,164,849.

**d. Intangible Damages**

The plaintiffs seek a variety of intangible damages. "In FTCA cases, it is within the factfinder's discretion to award intangible damages that are otherwise available under state law," determined with reference to "comparable and previously reported damage awards to determine the appropriate amount for a claimant's recovery." *Le I*, 2023 WL 4708003, at *14 (citing *Lebron v. United States*, 279 F.3d 321, 325–26 (5th Cir. 2002)); *Le II*, 138 F.4th at 273.

**1. Physical Pain, Suffering, and Mental Anguish**

"A factfinder may award damages for physical pain consciously suffered and experienced." *Id.* (citing *S. Pac. Transp. Co. v. Luna*, 730 S.W.2d 36, 38 (Tex. App.—Corpus

---

[185] Nieto Test., Hr'g Tr. Vol. II 93:15–94:25, Dkt. No. 80.

Christi 1987, no writ)). Similarly, "[a] plaintiff may recover damages for mental anguish resulting from a serious or traumatic bodily injury." *Id.* at *15.

While courts have wide latitude in issuing awards for pain and suffering, "[their] discretion is not unlimited": "In FTCA cases, courts will often look to previous reported damage awards in the state to determine the claimant's recovery for noneconomic damages." *Holcombe v. United States*, 584 F. Supp. 3d 225, 287 (W.D. Tex. 2022); *see also Lebron*, 279 F.3d at 326 (looking to reported decisions only as a basis for determining reasonableness of recovery). And under the Fifth Circuit's maximum recovery rule, a damages award will not be reduced if it is "within 133% of the highest comparable award, adjusting for inflation." *Le II*, 138 F.4th at 279.

The plaintiffs' largely (though not exclusively) rely on cases involving victims who have received permanent brain damage. *See* Dkt. No. 82 at 81–88 (collecting cases). Because the Court finds that no plaintiff suffers from permanent brain damage, they are inapposite except insofar as they might suggest a higher damage award is excessive.

Three cases, however, are illuminating. First, in *Koch v. United States*, the plaintiff fell while working on a government-operated vessel, which required surgeries to the plaintiff's spine and knee. 857 F.3d 267, 271 (5th Cir. 2017). The trial court awarded $1.3 million in damages for pain and suffering, observing that the plaintiff "could no longer sleep in a normal bed and . . . can no longer enjoy an active social life," or many of his one-time hobbies. *Id.* at 272.

Second, in *Tagle v. Galvan*, the plaintiff suffered various orthopedic injuries, some of which required surgery, after a serious car crash. 155 S.W.3d 510, 514 (Tex. App.—San Antonio 2004, no pet.). The trial court awarded $2 million for all damages, including pain

and suffering, though the decision did not clarify the extent to which the award included pain-and-suffering damages. *See id.* at 523 (Speedlin, J., concurring in judgment).

Last, in *Holcombe*, the plaintiff was injured in a mass shooting. 584 F. Supp. 3d at 299. She was shot five times, suffered fractured ribs and leg injuries, lost the ability to play sports, and developed depression and PTSD as a result of witnessing the tragedy, in which her mother perished, and her siblings were also injured. *See id.* at 299–301. The trial court awarded the plaintiff $2 million for past physical pain and mental anguish, along with $400,000 in future physical pain and mental anguish. *Id.* at 301.

The facts here are severe, to be sure. Each victim suffered great physical pain from the crash and have not been able to return to their lives as before. All three suffer from lingering pain and mental disorders. B.P., who was once an active athlete, no longer plays sports and faces the prospect of a lifetime of severe pain beyond that suffered by the other plaintiffs. Like the plaintiff in *Koch*, it is probable that B.P. must abandon her dreams of nursing, until and unless her physical pain recovers—something that is unlikely, given the record before the Court.

That said, each of these cases features much lower damage awards than the $3.3 million, $4.6 million, and $5.6 million sought for Nieto, J.G., and B.P., respectively. *See* Dkt. No. 82 at 77–78. The cases also suggest far greater damages are warranted than the few-hundred-thousand awards cited by the defendant. *See* Dkt. No. 83 at 27. On review of the record, the facts are more analogous to *Koch* and *Holcombe* and warrant an award in the middle range of those cases. The Court awards damages for pain, suffering, and mental anguish as follows:

- Nieto: $1,300,000;

- J.G.: $1,800,000;
- B.P.: $2,000,000.

### 2. Physical Impairment

Relatedly, the plaintiffs seek damages for physical impairment and loss of enjoyment of life. "Physical impairment encompasses the loss of the injured party's former lifestyle." *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 253 (Tex. App.—Texarkana 2005, no pet.). It is also known as "loss of enjoyment of life." *Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.). However, a plaintiff can only receive physical impairment damages in certain circumstances. He must prove that "(1) he incurred injuries that are distinct from, or extend beyond, injuries compensable through other damage elements; and (2) these distinct injuries had a substantial effect." *Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 402 (Tex. App.—Houston [14th Dist.] 2010, no pet.). "While other types of losses may factor into a claim for physical impairment, where other elements of noneconomic damages such as pain, suffering, mental anguish, and disfigurement are submitted, 'there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life.'" *Holcombe*, 584 F. Supp. 3d at 288 (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003)).

The Court concludes that the damages awarded for the plaintiffs' pain, suffering, and anguish subsume the physical-impairment damages. *See* Dkt. No. 82 at 78. Indeed, the plaintiffs' grounds for physical-impairment damages stems from the cost of continued medical treatment, which was accounted for in the Court's award of future medical damages. *Id.* at 78–79 nn.18–20; *Enright*, 330 S.W.3d at 402 ("[p]hysical impairment

damages . . . can encompass both economic and non-economic damages"). Thus, the Court does not award any plaintiff damages for physical impairment.

### 3. Disfigurement Damages

The plaintiffs assert that each crash victim is entitled to disfigurement damages using the following formula: the cost of laceration repair multiplied by the number of weeks in a year and then multiplied by the estimated remaining years in each victim's life.[186] The defendant contends that any award for pain and suffering adequately accounts for the plaintiffs' disfigurement. Dkt. No. 83 at 28.

Disfigurement means "that which impairs the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapened, or imperfect, or deforms in some manner." *Hopkins Cnty. Hosp. Dist. v. Allen*, 760 S.W.2d 341, 343 (Tex. App.—Texarkana, no writ) (citing *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960)). A plaintiff can also recover for future disfigurement damages if there is "a reasonable probability of additional scarring or deforming" arising from the original injury. *Id.* Said differently, "the damages for disfigurement must be measured from the date of the injury until the time the disfigurement is expected to end." *SunBridge*, 160 S.W.3d at 252.

The Court cannot agree that the pain and suffering damages adequately compensate the victims here. True, it is "commonplace (and common sense) that many forms of noneconomic damages can overlap with each other." *In re Rudolph Auto., LLC*, 674 S.W.3d 289, 305 (Tex. 2023) (citing *Golden Eagle*, 116 S.W.3d at 770, 773–74). But the Court need only avoid awarding the plaintiffs when if, "under some other element," the Court has "awarded a sum of money for the same loss." *Id.*

[186] Pl.'s Closing Statement, Hr'g Tr. Vol. III 242:22–243:10, Dkt. No. 81.

For each plaintiff, there is evidence of disfigurement for which the Court did not account in awarding pain-and-suffering damages. Nieto suffers from permanent scars that are located on her head, face, neck, and shoulder—all visible places.[187] She suffered additional scarring from her follow-up surgeries and also has scarring on her arms.[188] Her damages for pain and suffering do not account for these lasting marks. Moreover, they do not account for Nieto's conscious need to obscure these scars with makeup.[189] These are harms that will last a lifetime.

J.G.'s disfigurement is also not accounted for. Nieto testified that J.G. has become the victim of bullying at school because of her scars.[190] J.G. suffers from permanent scarring to her eyes, arms, and feet, and lost a tooth in the crash, which has since been repaired.[191] While that bullying will likely someday cease, the scars will remain. These scars are harms that will last a lifetime.

Last is B.P. Her visible injuries are primarily limited to those suffered in the crash and her limited range of mobility. *See* Dkt. No. 82 at 60. The plaintiffs also presented testimony that B.P. will likely require future surgery to treat her arthritis, which will leave a

[187] Pl.'s Exs. 11 at 2, 3; 21 at 1, 2, 6, 26–28.

[188] Nieto Test., Hr'g Tr. Vol. II 77:4–9, 77:18–78:2, Dkt. No. 80.

[189] *See id.* at 77:4–78:2; *see also Exxon Mobil Corp. v. Brown*, 729 S.W.3d 625, 655 (Tex. App.—Houston [14th Dist.] 2026, no pet.) ("Plaintiffs who feel ugly, who hide their disfigurement under clothes and gloves, and who avoid shaking hands, are embarrassed by their scars and may recover future damages absent evidence that there will be future scarring or deforming.") (quotation omitted).

[190] Nieto Test., Hr'g Tr. Vol. II 77:16–78:2, 80:22–81:17, Dkt. No. 80.

[191] *See* Pl.'s Exs. 21 at 10, 14, 22, 23–24; 22 at 2–4.

scar.[192] Because the Court accounted for B.P.'s physical limitations in its pain-and-suffering award, her disfigurement damages must necessarily be limited.

Finally, before determining damages, the Court accounts for damage awards in like cases. Several cases are relevant here. In *SunBridge*, a nursing home patient was thrown from her wheelchair and died four days later from her injuries. 160 S.W.3d at 236. The patient suffered from "swelling, distortion, and discoloration" of her face and an injury to her tongue. *Id.* at 252. While the appellate court ordered remittitur, it determined that disfigurement damages of nearly $400,000 for those four days of her life was warranted. *Id.* at 253.

In *Diamond Offshore Services Ltd. v. Williams*, the plaintiff suffered a back injury at work. 510 S.W.3d 57, 63 (Tex. App.—Houston [1st Dist. 2015), *rev'd on other grounds*, 542 S.W.3d 539 (Tex. 2018). Later surgery left a scar on the plaintiff's back, and he was forced to "walk[] with a noticeable limp." *Id.* at 77. The jury awarded $575,000 for past and future disfigurement. *Id.* at 76.

In *Brown*, an industrial plant explosion injured several workers; two of whom were awarded disfigurement damages. *See* 729 S.W.3d at 634. The first worker required surgery, which left a scar on his lower back. *See id.* at 654–55. While not visible to the public, he felt that it was "ugly" and "[felt] insecure about himself" as a result. *Id.* The jury awarded $500,000 in past and future disfigurement damages, and the appellate court affirmed. *Id.* at 635, 655. The second worker also required spinal surgery, but this surgery left a scar around her neck. *Id.* at 655–56. It soon became the subject of gawking and intrusive question-asking; and the record established that she would likely require an additional

[192] Goff Test., Hr'g Tr. Vol. II 210:17–22, Dkt. No. 79.

surgery (and thus more scarring) to treat lingering spinal issues. *Id.* The jury awarded, and the appellate court affirmed, a disfigurement award of $1,000,000. *Id.* at 636, 656.

Last, the Court recognizes that many disfigurement cases have resulted in smaller awards. *Diamond Offshore*, 510 S.W.3d at 77 (collecting cases). But the fact that smaller awards are not excessive "does not support the conclusion" that higher awards "are excessive." *Id.*

The plaintiffs' proposed findings and conclusions ask for over $1 million in relief for Nieto and J.G., and over $600,000 in relief for B.P. While the Court recognizes that these are harms that will last a lifetime, the plaintiffs' proposals are somewhat excessive.[193] *SunBridge*, *Diamond Offshore*, and *Brown* all represent higher-end jury awards for disfigurement. The Court cannot conclude that any plaintiff's disfigurement is worse than the disfigurement suffered by the *Brown* plaintiff who suffered a publicly visible and deforming injury and was further exposed to the likelihood of future surgery and scarring. Each plaintiff has one, but not the other. J.G. and Nieto are visibly scarred, but neither requires future surgery. B.P. requires future surgery, but there is no evidence of her suffering from visible scarring.

On the other hand, *SunBridge* establishes that even short-term disfigurement can be substantial. And *Diamond Offshore* establishes that less visible wounds (such as Nieto's makeup-obscured scars) can still disfigure. In light of the facts above, and having considered relevant cases on damages, the Court concludes that the plaintiffs are entitled to past and future disfigurement damages as follows:

[193] The Court notes that the plaintiffs calculate damages in reliance on the value of certain future treatment costs. *See* Dkt. No. 82 at 80 & nn. 21–23. The Court declines to adopt this approach.

- Nieto: $500,000
- J.G.: $800,000;
- B.P.: $200,000.

**3. Conclusion**

The events of February 12, 2023 were entirely avoidable. Had Jayleah Everitt done the bare minimum required of any reasonable driver, she would have paid attention to the road. She did not. Because of her negligent actions, a mother and two young girls face a lifetime of injury. For the foregoing reasons, the Court finds the defendant liable on the plaintiffs' claim of negligence. The Court finds that neither Tom Green County nor TxDOT are responsible for the collision. The Court also finds that Nieto's failure to wear a seatbelt did not exacerbate any of her injuries. Thus, the defendant is liable for all of the damages suffered by the plaintiffs.

The defendant is liable for damages suffered by Alexandria Nieto in the amount of $2,022,929.04, which includes:

- $56,707.04 for past medical expenses;
- $166,222 for future medical expenses;
- $1,300,000 for pain, suffering, and mental anguish; and
- $500,000 for disfigurement.

The defendant is liable for the damages suffered by J.G. in the amount of $2,838,973.16, which includes:

- $25,666.98 for past medical expenses;
- $213,306.18 for future medical expenses;
- $1,800,000 for pain, suffering, and mental anguish; and

- $800,000 for disfigurement.

The defendant is liable for the damages suffered by B.P. in the amount of $3,750,606.00, which includes:

- $122,839 for past medical expenses;
- $262,918 for future medical expenses;
- $1,164,849 for future loss of earning capacity;
- $2,000,000 for pain, suffering, and mental anguish; and
- $200,000 for disfigurement.

The Court finds that plaintiff Ryan Pearl did not suffer any damages as a result of the defendant's negligence, and he is thus not entitled to any award.

Final judgment shall issue accordingly.

So ordered on August 20, 2026.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE